Charles F. Magill (SBN 144181)
Laura M. Guzman Magill (SBN 177380)
MAGILL & GUZMAN MAGILL
1060 Fulton Mall, Ste. 806
Fresno CA 93721
(559) 857-6900
Lmagillaw@aol.com
(Affiliate Attorneys of the Pacific Justice Institute)

Attorneys for Plaintiff Brad Lopez

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA
## FRESNO DIVISION

| | |
|---|---|
| **BRAD LOPEZ**, <br><br> Plaintiff, <br><br> v. <br><br> **FRESNO CITY COLLEGE, DR. CYNTHIA E. AZARI**, in her individual and official capacities as President of Fresno City College; **DR. CHRISTOPHER VILLA**, in his individual and official capacities as Vice President of Student Services at Fresno City College. <br><br> Defendants. | Case No. _____ <br><br> **COMPLAINT FOR INJUNCTIVE RELIEF, DECLARATORY JUDGMENT AND DAMAGES** <br><br> [42 U.S.C. 1983] <br><br> Date: <br> Time: <br> Courtroom: <br> Hon.: |

Plaintiff, Brad Lopez (or "Dr. Lopez"), by and through counsel, and for his Complaint against Defendants Dr. Cynthia E. Azari and Dr. Christopher Villa respectfully requests this court to issue a declaratory judgment, injunctive relief and award damages due to the denial of speech, freedom from retaliation, academic freedom, and due process guaranteed under the First and Fourteenth Amendments to the U.S. Constitution. Dr. Lopez hereby alleges as follows:

### INTRODUCTION

1.      The cornerstone of public higher education is the freedom of professors to discuss competing theories and ideas in the classroom. This freedom, comprised of the freedom of

speech and academic freedom, preciously guards the faculty of public colleges and universities so that they can encourage students to ask innovative questions and then answer those questions with a variety of ideas and theories. Unfortunately, at Fresno City College ("FCC"), a college within the State Center Community College District ("SCCCD"), referred to as the "District," these freedoms have been jeopardized because of the complaint of two students enrolled in –Dr. Lopez's class and another student who has never been enrolled in a course taught by Dr. Lopez. These students complain of being offended regarding statements made by the Plaintiff relative to third parties. The one student who has never been enrolled in his class claimed that these alleged offensive statements are the basis of sexual harassment. Instead of protecting Dr. Lopez's right to answer questions and define the concepts according to established principles in medical and scientific literature and textbooks, and to stimulate critical thinking in compliance with critical thinking requirement of the FCC curriculum, the Defendants placed in Plaintiff's file a disciplinary reprimand for alleged unprofessional conduct and unsatisfactory performance.

2.    By taking this adverse employment action against Dr. Lopez, Defendants have and continue to censor his speech. All of the actions alleged herein were committed by the Defendants acting under color of state law.

## JURISDICTION AND VENUE

3.    This action raises federal questions under the First and Fourteenth Amendments to the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

4.    This Court has original jurisdiction over these federal claims pursuant to 28 U.S.C. §§ 1331 and 1343 and supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

5.      This Court has authority to award the requested declaratory relief under 28 U.S.C. § 2201; the requested injunctive relief under 28 U.S.C. § 1343(3); the requested damages under 28 U.S.C. § 1343(3); and attorneys' fees under 42 U.S.C. § 1988.

6.      Venue is proper under 28 U.S.C. § 1391 in the Eastern District of California because a substantial part of the actions or omissions giving rise to this case occurred within the Eastern District and at least one Defendant resides in the Eastern District.

## INTRADISTRICT ASSIGNMENT

7.      Pursuant to Civil L.R. 3-2(c)-(d) & 3-5, this is a civil rights case, in a non-excepted category, suitable for assignment to the Fresno division because the civil action arose in Fresno County.

## PARTIES

8.      Plaintiff, Brad Lopez, is a resident of Fresno, California. He is a tenured member of the faculty at Fresno City College where he has taught for the last thirty-five (35) years.

9.      Defendant, Cynthia E. Azari (Dr. Azari), is and was at all times relevant to this Complaint, President of FCC. President Azari's duties include the oversight of FCC, the execution of policies and regulations that govern the college, and decision making concerning faculty employment. Dr. Azari acted under color of state law when she violated Dr. Lopez's First and Fourteenth Amendment rights and rights under District policy. She is sued in her official and individual capacities.

10.     Defendant Christopher Villa (Dr. Villa) is, and was at all times relevant to this Complaint, Vice President of Student Services. Dr. Villa acted under color of state law when he violated Dr. Lopez's First and Fourteenth Amendment rights and rights under District policy. He is sued in his official and individual capacities.

## FACTUAL BACKGROUND

## A.  Dr. Lopez's Teaching Career at the District

11.     In 1971, Dr. Lopez received a Bachelor of Arts degree with a major in Zoology from California State University, Fresno, in 1972, an Associate of Science in Respiratory Care, in 1973-1975, completed two years of course work toward a Master's degree with a major in Public Health from Loma Linda University, California, in 1977, a Master's of Science degree with a major in Health Science from California State University, Fresno and in 1996, Dr. Lopez earned a Doctorate of Education with a major in Educational leadership, in a joint doctoral program from the University of California, Davis and California State University, Fresno.

12.     Dr. Lopez is a tenured member of the faculty and has taught at FCC for the last thirty-five years.

13.     From 1975 and for the next ten years, Dr. Lopez held the position of Clinical Director of the Respiratory Care Program at FCC and for a further year was Program Director of the Respiratory Care Program.

14.     In 1971 Dr Lopez taught the lab portion in Human Physiology at California, State University, Fresno.

15.     For the last eighteen years, Dr. Lopez has been an instructor in traditional Pharmacology, Health Information Technology, Health Science classes and became the first instructor at FCC to teach distance education in online classes and video-conference classes. He was the first instructor to use media streaming where all the words are captioned to meet the needs of disabled students and is still the only instructor to podcast all lectures in audio and video format available to all students at iUniversity through the college server.

16.     Dr. Lopez authored and co-authored several California legislative bills that were signed into law, made numerous presentations, designed, developed and implemented

conferences, has published university course materials and received teaching and research awards.

17.     During the thirty-five years of his employment by the District, Dr. Lopez's work performance was more than satisfactory and he has never been disciplined until the instance that is the subject of this lawsuit.

18.     Three most recent Health 1 Classroom peer evaluations in spring 2009, spring 2006 and spring 2003 invariably carried the strongest evaluation "satisfactory," sometimes with additional complimentary comments such as "excellent use of visual aids and technology effects," "very organized," "very knowledgeable," "class actively involved," "many students engaged in lecture with questions and responses." Not one peer evaluator indicated an area needing improvement.

19.     Student response questionnaires and student comments for spring 2009, spring 2006 and spring 2003, indicate that Dr. Lopez was much appreciated as an instructor. The vast majority of students indicated that Dr. Lopez knew the subject matter of his courses; he encouraged students to ask questions; he encouraged individual thinking and differences of opinion; and conducted his classes fairly with respect to age, gender, disability, nationality, race, religion and sexual orientation.

20.     An anonymous December 2009, student survey shows that the vast majority of students appreciate the Health Science 1 course and the instructor.

21.     Unsolicited student e-mails said the course was fun and helped them understand, recognize and appreciate the importance of healthy living and to apply this information to improve personal health.

22.     In 2007, the District paid Dr. Lopez approximately 105,000.00 dollars in compensation for his teaching services.

23.     In 2008, the District paid Dr. Lopez approximately 105,000.00 in compensation for his teaching services.

24.     Dr. Lopez had never been admonished by the Dean of Health Science Carolyn Drake (Dean Drake) prior to the April 30, 2009, teaching evaluation conference sent to Dr. Lopez on March 24, 2010, when, for the first time, he saw the final evaluation with FCC president Dr. Azari's signature. All concerns in that evaluation were addressed by Dr. Lopez in May 2009. He also indicated that he had placed fifteen unsolicited student comments in Dean Drake's mailbox two weeks before the evaluation which were never taken into account by the FCC administration.

**B. The November 4 and 5, 2009 Health Science 1Classes**

25.      Dr. Lopez has taught FCC's Health Science course (HLTH 1-18769) for almost eighteen years.

26.     On November 4, 2009, Dr. Lopez lectured on Heredity and Health covering pages 346-358 of the course's textbook along with pages 75-80 of the Guide. Prior to the lecture Dr. Lopez presented information on the role of chromosomes and heredity from both a historical and modern prospective. Dr. Lopez's lecture also consisted of a discussion on the topic from a moral perspective referencing selected biblical passages that may be helpful for further evaluation. Dr. Lopez assigned homework on the topic "Was Jesus haploid or diploid? State your answer and explain why." All assigned homework for the course is optional and not required and the grade is never affected if a student fails to turn in this assignment.

27.     The students were provided a video presentation on DNA and how the process of transcription takes place in a ribosome. Dr. Lopez asked the class a question about the DNA process and why this particular progression used groups of three and not two or four during the process. A student responded "The Father, The Son and the Holy Spirit"? Dr. Lopez light heartedly answered "that's right." No student complained to Dr. Lopez that they were offended during the class or after the class.

28.     On November 5, 2009, the class was on human sexuality, (textbook pages 185-202) and covering homosexuality (pages 191-192). Statistics on the emotional health of human sexuality, sexually transmitted diseases as it relates to reproduction, consumer and environmental health and how it affects homosexuality in males and females were covered. The presentation was based on the textbook and on Dr. Lopez's previous investigation and research.

29.     The same day, Mr. Jay Matthew Burts, an FCC student who had never enrolled in Dr. Lopez's Health Science 1 class, went to Dr. Lopez's office. Mr. Burts quoted an unidentified female friend (who was enrolled in Dr. Lopez's Health Science 1 class) as having been upset because Dr. Lopez was showing slides in class that were "homophobic and anti-gay." She was also upset by statistics Dr. Lopez had given and because he had referenced the Bible in topics prior to, but not including, homosexuality. Although Mr. Burts had never enrolled in Dr. Lopez's class, he challenged Dr. Lopez on his class PowerPoint presentation on facts on homosexuality. Dr. Lopez willingly answered his questions, noting the complexity of the issue and providing examples mentioned in the textbook and the lecture on the two slides complete, with statistical references. Mr. Burts insisted that the information in the lecture including the statistics was false, continuously interrupted Dr. Lopez and did not listen to anything Dr. Lopez

had to say. Dr. Lopez offered to e-mail relevant resource materials to Mr. Burts. Mr. Burts asked that materials be sent to stopthehate.com.

30.     As Dr. Lopez was getting ready to send the resource materials to Mr. Burts, Dr. Lopez's supervisor and Dean of Health Science, Dr. Carolyn Drake sent Lopez a notice asking him to respond in writing within three days to formal grievances from Ms. Jacqueline Mahaffey, a student enrolled in Dr. Lopez's Health Science 1class in the Fall of 2009 and from Mr. Burts. Dean Drake informed Dr. Lopez that Mr. Burts had been to see Dean Drake and Dr. Azari and demanded at both meetings that Dr. Lopez be fired. It became clear to Dr. Lopez that it would serve no pedagogical purpose to e-mail the resource materials to Mr. Burts, because Mr. Burts was not ready to listen to a viewpoint different from his own.

### C. The Alleged Student "grievances" and District's "Investigation"

31.     On December 7, 2009, Ms. Mahaffey and Mr. Burts simultaneously filed grievances against Dr. Lopez.

### Ms. Mahaffey's statement titled "a formal grievance against Dr. Bradley Lopez"

32.     Ms. Mahaffey, a student in Dr. Lopez's class filed a grievance on the grounds of "blatant disregard for separation of church and state…. and discriminatory slander towards homosexual community." She claimed to have been aggrieved by the optional assignment on Jesus as diploid or haploid.

33.     Ms. Mahaffey was further aggrieved that during the November 5, 2009, class Dr. Lopez asked the class a question about the DNA process and why this particular progression used groups of three nucleotides and not two or four during the process, a student responded "The Father, The Son and the Holy Spirit." Ms. Mahaffey was also offended by Dr. Lopez's light hearted answer, "That's right."

34      Ms. Mahaffey alleged that on November 10, 2009, Dr. Lopez read the Bible regarding the creation of a fetus. She did not once complain to Dr. Lopez but later filed her grievance noting "I had a feeling that this would be an ongoing issue." Ms. Mahaffey did not seek to resolve the issue directly with Dr. Lopez, nor did she provide evidence substantiating her claims or refuting the information and statistics provided by Dr. Lopez. A true and correct copy of said grievance is attached as "Exhibit A" to this Complaint and incorporated in full.

35      Ms. Mahaffey never complained to Dr. Lopez about Health Science 1, during or after class. Indeed, Ms. Mahaffey did not follow the FCC "grievance petition" procedure on the grievance petition form, which requires that a grievance goes through several appeal levels. 1) A student makes a statement of grievance. 2) The staff member concerned must reply in five days. If the grievance is not resolved, 3) the aggrieved student must appeal within five working days to the Divisional Associate Dean who must respond to the grievance within five working days. If the student is still not appeased, he appeals to 5) the Dean of Instruction or Dean of Students who must respond within five working days. If still dissatisfied, the student then appeals to 6) the Academic Standards Committee for academic matters or for non- academic matters, to the President who makes the final decision.

36      On December 8, 2009, Dr. Lopez received Ms. Mahaffey's letter and responded on December 9, 2009. Dr. Lopez denied and continues to deny the allegations of "blatant disregard for separation of church and state…. and discriminatory slander towards homosexual community." Dr. Lopez explained that Health Science requires students had to be taught critical thinking skills, to learn what was true and what was not and to ascertain the difference.

**Mr. Burts statement entitled "a formal grievance against Dr. Bradley Lopez"**

37.     Mr. Burts, an FCC student, who had never attended Dr. Lopez's class, filed a formal grievance against Dr. Lopez, recounting how he was approached by an unnamed student/ friend in Dr. Lopez's Health 1 class. The friend said she was upset and offended by Lopez's classroom slides, which she had perceived as "homophobic and anti-gay." The friend said that Dr. Lopez had shown a list of facts that claimed homosexuality should be "declared a mental illness…" that homosexuals "are in need of counseling… [and] are degrading society." Dr. Lopez denies these hearsay allegations as false.

38.     Mr. Burts went to Dr. Lopez's office for a confrontation. Although Mr. Burts was not in his Health Science 1 class, Mr. Burts indicated on his grievance that Dr. Lopez "was glad to share with me how he feels…..I tried informing him all of the 'facts' he was saying were all false," and were "hate speech." Mr. Burts did not provide evidence substantiating his claims or refuting the information and statistics provided by Dr. Lopez but demanded in his grievance, that Dr. Lopez "ceases all forms of hate speech in his class," gives a written/oral apology to his class and that staff at FCC should attend a culturally competent training on diversity. A true and correct copy of said grievance is attached as "Exhibit B" to this Complaint and incorporated in full.

39.     Mr. Burts did not follow the FCC "grievance petition" procedure on the grievance petition form, which requires that a grievance goes through several appeal levels.

40.     On December 8, 2009, Dr. Lopez received an undated page of the formal grievance from Mr. Burts. Dr. Lopez responded to this undated page on the same day, denied and continues to deny uttering hate speech and giving false information.

### District policies

41.     Administrative Regulation 4030 provides in relevant part as follows:

> The District is unequivocally and unalterably committed to the principle of academic freedom in its true sense, which includes freedom to study, freedom to learn and freedom to teach and provide educational professional services to students. Academic freedom encompasses the right of an instructor to discuss pertinent subjects within his field of professional competency in the classroom, consistent with course objectives…..

> Neither District officials nor outside individuals or groups may interfere with or censure an academic employee because of the employee's proper treatment of pertinent subjects, or provision of proper educational services to students is precluded by the principle of academic freedom.

> Faculty must however, accept the responsibility that accompanies academic freedom…. (which) does not give faculty freedom to engage in indoctrination… nor justify non professional conduct….

A true and correct copy of said AR 4030 is attached as "Exhibit C" to this Complaint and incorporated in full.

42.    Board Policy and Administrative Regulation 4030 also provide that:

> "The instructor has the right to study and investigate, interpret his/her findings and express resulting conclusions to students. The instructor has the responsibility to be thorough in his investigations and to draw conclusions supported by the findings. Because human knowledge is limited and changeable, the instructor may present views which are controversial and evaluate opinions held by others while simultaneously respecting and valuing their right of their free expression. Please confirm language

43.    5 C.C.R § 53200 (2) (a) 2F has been adopted by FCC and provides in relevant part that "The coursework calls for critical thinking and the understanding and application of concepts determined by the curriculum committee to be at college level."

44.    The Course outline of record, curriculum reference guide states that "Assignment examples can include supplemental reading materials beyond the required text (s)….. Optional and alternate assignment examples can in some cases, be included. The

difficulty standard for degree-applicable credit courses requires that assignments must reflect

college-level effort particularly in terms of critical thinking."

      45.    Administrative Regulation 3430 provides in relevant part as follows:

> A hostile academic environment exists where it is permeated by insults or abusive comments directed at an individual or group based on…sexual orientation, ..... that are not relevant to the subject matter of the class….an environment may also be hostile toward anyone who merely witnesses unlawful harassment in his immediate surroundings even though the conduct is directed at others. The determination of whether an environment is hostile is based on the totality of circumstances, the severity of the conduct, …or whether the conduct unreasonably interferes with an individual's learning.
> 'Hostile environment' sexual harassment occurs when unwelcome conduct based on a person's gender is sufficiently severe or pervasive so as to alter the conditions of an individual's learning, unreasonably interfere with an individual's academic…performance or create an intimidating, hostile or abusive learning environment.

A true and correct copy of said policy is attached as "Exhibit D" to this Complaint and

incorporated in full.

**The investigation conducted by Dr. Villa**

      46.    On December 10, 2009, FCC's Vice President of Student Services Defendant

Villa, wrote to Mr. Burts acknowledging receipt of "your complaint of sexual harassment" and

informing Mr. Burts that his office would begin to investigate the "complaint…..on the basis of

harassment," and would contact Mr. Burts soon to arrange an interview. Dr. Villa was the first

person to mention a complaint on the basis of sexual harassment and Mr. Burts had filed a

grievance and not a complaint on the basis of (sexual) harassment. The classification title

specified for document retrieval reads "…..SH Complaints (2009)/Burts, Jay Matthew- Receipt

of SH Complaint against instructor Brad Lopez 12.10.09."

      47.    On February 8, 2010, Dr. Villa requested a meeting with Dr. Lopez for

February 10, 2009. D. Lopez requested documents supporting any student allegations/complaints but Dr. Villa stated that Dr. Lopez "could read them and respond to them at the meeting" (in two days time). Dr. Lopez requested an extension of time by which to respond and seek counsel but was denied.

48.     On February 8, 2010, The American Civil Liberties Union (ACLU) wrote to FCC president Dr. Azari and put FCC on notice to "act expeditiously and to take whatever steps are necessary" regarding Dr. Lopez's Health Science class.

49.     On February 10, 2010, Dr. Lopez and Dr. Villa met. Dr. Lopez asked which student grievances Dr. Villa considered sexual harassment but Dr. Villa informed Dr. Lopez that he was not allowed to ask questions. Dr. Lopez asked Dr. Villa if there were "any other documents in your file regarding this matter." Dr. Villa did not answer in the affirmative nor provide any documents. Dr. Lopez again requested an extension of time by which to respond and seek counsel but was denied.

50.     Defendant Villa, requested that Dr. Lopez submit information regarding an alleged "student complaint" he received.

51.     On February 11, 2010, Dr. Lopez replied to Defendant Villa's request for a meeting with a request for supporting documents (the sexual harassment form and information as to why he received grievance letters dated December 7, 2009 on February 10, 2010). Dr. Villa replied that Dr. Lopez was not entitled to information as a condition for cooperation with the investigation and ordered Dr. Lopez to appear before him on February 17, 2010 between 8:30 and 3:30 p.m.

**Mr. Burt's belated addition of a "complaint of sexual harassment" form to his grievance filed on December 7, 2009**

52.     On February 16, 2010, Mr. Burts submitted a "Complaint of sexual harassment" form to FCC. In the space provided for a description of the ways in which the complainant felt sexually harassed, Mr. Burts wrote "see attached." Attached is a copy of the grievance he had filed on December 7, 2009. A true and correct copy of said Mr. Burts' grievance is attached as "Exhibit E" to this Complaint and incorporated in full.

53.     Dr. Lopez emphatically denies all allegations of sexual harassment. In his thirty-five years as an instructor, no formal evaluation, no anonymous student survey, questionnaire or unsolicited e-mail had ever accused Dr. Lopez of sexual harassment.

### Mr. Belville's letter "Re: Professor Brad Lopez"

54      On February 17, 2010, a letter dated February 11, 2009, from Mr. Belville was received at FCC's student's office. The same letter had been hand delivered on February 11, 2010, to the president of FCC, Dr. Azari. Mr. Belville had taken Health Science 1 class two years prior, in the spring semester of 2007-2008. He alleged in his letter that many days, he had felt "hurt, intimidated and angry" regarding what he heard about Jesus, creation and homosexuality. Mr. Belville claimed Dr. Lopez said "homosexuals are an abomination," "faggots," "homosexuality is a sin." He falsely claimed Dr. Lopez would stop the videographer "just before he said something alienating or discriminatory." Mr. Belville did not file his grievance within the required thirty (30) days after the beginning of the fall or spring semester following the date of the alleged events. All these allegations were and still are, categorically denied by Dr. Lopez who has never, in class or out, said these words attributed to him. A true and correct copy of said letter from Mr. Belville is attached as "Exhibit F" to this Complaint and incorporated in full.

55.     Mr. Belville had never once complained to Dr. Lopez about the content of Health Science 1 during the 2007-2008 Spring Semester.

**The on-going investigation by Defendant Villa**

56.     On February 18, 2010, Dr. Lopez went to a second meeting with Dr. Villa. Dr. Villa provided District policies on grievances, indoctrination and prohibition of harassment (referred to by Defendant Villa and Mr. Burts as sexual harassment) but failed to provide FCC and District policies on Academic Freedom and the statewide Academic Senate guide on critical thinking from Title 5, adopted by FCC and the District.

57.     On February 23, 2010, Dr. Lopez responded to Defendant Villa's request for information during the February 18, 2010 meeting. Dr. Lopez reiterated his denial of all Ms. Mahaffey's allegations.

**D. The final administrative decision on the grievances from Ms. Mahaffey and Mr. Burts and letter from Mr. Belville**

58.     On March 8, 2010, Dr. Villa sent a letter to the complaining students. Dr. Villa wrote that the administrative decision was that Dr. Lopez had violated Administrative regulation 3430 because he had insulted homosexuals by describing them as having a "mental disorder" and by suggesting psychological counseling as a remedy. Dr. Villa conceded that the District's academic freedom in Board Policy and Administrative Regulation 4030, allowed an instructor to interpret personal findings and communicate them "even when at variance with those of other persons,…even if at odds with other professionals in his field," but found that academic freedom prohibited indoctrination, presentation of irrelevant material and that in any event, the harassment policy always prevailed over the academic freedom policy.

59.     Dr. Villa also concluded in his letter that Dr. Lopez had violated District policy because teaching religious material neither attained course objectives nor achieved educational principles. Dr. Villa therefore determined that Dr. Lopez had engaged in religious indoctrination.

Dr. Villa was concerned that reading the Bible in Health Science 1 class or assigning readings from the Bible "could subject the District to legal threat for violation of the Establishment Clause and jeopardize transfers of student credits to other institutions."

60.     On March 24, 2010, the president of FCC, Dr. Azari sent a certified letter to Dr. Lopez reprimanding him and pursuant to Education Code Sections 87732 and 87734, giving him formal notice, ninety (90) days prior to initiating formal disciplinary proceedings for dismissal to correct deficiencies of unsatisfactory conduct and unsatisfactory performance as established in the investigation conducted by Defendant Villa. Dr. Azari described the following events:

> "1) In front of your class you insulted gays and lesbians as 'abnormal' and in need of psychological counseling.
> 2) In class and in taped lectures you required the students to purchase, you taught religious principles from the Bible in place of established curriculum for the health course. You persisted despite student complaints, admonishments from your dean and comments of concern in a teaching evaluation, attached hereto."

61.     The reprimand accused Dr. Lopez of "unprofessional conduct….which created a hostile academic environment," of harassment and of religious indoctrination and ordered him to cease teaching religious materials and assigning readings from the Bible or other religious texts in class or otherwise relying on the Bible as an authority in the assigned matter," or else he would be dismissed.  Dr. Azari further erroneously claimed Dr. Lopez had ignored prior student complaints, Dean admonishments, comments in an evaluation. A true and correct copy of said reprimand is attached as "Exhibit G" to this Complaint and incorporated in full.

62.     Dr. Azari sent copies of the reprimand to the Board members.

63.     Dr. Azari indicated that the Administration was willing to assist Dr. Lopez in overcoming said deficiencies or unprofessional conduct but there has been no further communications from the administration on this matter.

**Plaintiff's response to the written reprimand**

64.     On April 29, 2010, Dr. Lopez responded to the reprimand and refuted that he had

violated the Education Code Sections 87732, 87734, District Administrative Regulations 3430

and 4030 and FCC Board Policy 4030. Dr. Lopez responded specifically to every allegation in

Dr. Azari's reprimand, clarified that he had never directed abusive statements to any individual

based on sexual orientation, that he had not received Dean admonishments prior to the 2009 one

and asked for documents (with dates, student names, and specific unacceptable language)

validating the Dean admonishment in the April 30, 2009 evaluation and for clarification on

specific language in his lectures which included "religious principle from the Bible instead of

established curriculum"A true and correct copy of said response to the reprimand is attached as

"Exhibit H" to this Complaint and incorporated in full.

65.      In the thirty-five years he has taught at FCC, Plaintiff Lopez denied saying in any

class that gays and lesbians were "abnormal" or "in need of psychological counseling." His

statement had been "because over 95% of the population is not homosexual, for those who are

'one alternative is psychological counseling.'"

66.     Dr. Lopez has occasionally used the Bible, the Koran and the Talmud because

they are among the oldest manuscripts in existence and provide valuable historical support for

safe health practices. Occasionally, relevant portions were also used to supplement and enhance

curriculum content and stimulate critical thinking as required by District academic standards. Dr.

Lopez was on the Health Committee that wrote the current Health Science 1 curriculum to

conform to Title 5 and which was approved by the curriculum committee at FCC.

67.     When Health Science 1 became an online course, the curriculum committee

informed Dr. Lopez that to obtain course approval a statement on critical thinking was required.

68.     Dr. Lopez limits terms relating to homosexuality in class to those found in medical, scientific literature and textbooks.

69.     Dr. Lopez had never been admonished by Dean Drake prior to the April 30, 2009 teaching evaluation sent to Dr. Lopez on March 24, 2010.

70.     Dr. Villa repeatedly refused to provide Dr. Lopez copies of meeting notes.

71.     Dr. Villa did not seek to make a reasonable attempt to resolve the grievances directly between the students and Dr. Lopez nor did he seek to schedule a meeting between Dr. Lopez and Mr. Burts when Mr. Burts filed a belated sexual harassment complaint.

72.     Pursuant to AR 4030 and BP 4030 on Academic Freedom, Dr. Lopez complies with his duties to stimulate a climate which will foster principles of intellectual freedom.

73.     Mr. Burts demanded that Dean Drake and Dr. Azari fire Dr. Lopez.

74.     During his investigation, Dr. Villa completely disregarded, all statements and documents provided by Dr. Lopez, including favorable feedback in a December 2009 anonymous student survey.

75.     Dr. Villa neither provided nor did he ask the aggrieved students to provide, documents disputing facts provided by Dr. Lopez.

76.     Defendants Azari and Villa disregarded the twenty-nine e-mails and letters from students and other people who had learned of the complaints and wanted to vouch for Dr. Lopez.


**CLAIMS FOR RELIEF**


**Count I-Violation of Freedom of Speech under the U.S. Constitution (42 U.S.C. § 1983)**

**First Amendment Retaliation – All Defendants**

77.     Plaintiff hereby reiterates and adopts each and every allegation in the preceding paragraphs 1-76.

78.     Dr. Lopez's speech touched on matters of public concern involving an issue of social, political or other interest to a community or public, a subject of legitimate news interest or of general interest. His interest in his expression outweighed FCC interest in providing effective and efficient services to the public. Plaintiff's speech was a substantial factor in an adverse employment decision. Dr. Lopez has suffered injury likely to chill an ordinary person to engage in that speech.

79.     Occasional references to ancient manuscripts such as the Bible, Koran and Talmud allow students to learn different viewpoints and stimulates critical thinking. The information presented in Dr. Lopez's classes is protected speech and Dr. Lopez's interest in complying with FCC requirement of critical thinking far outweighs the District's interest in regulating the content of the Health Science 1 class. FCC services performed through Dr. Lopez's remained effective and efficient and did not interfere with Dr. Lopez's performance of his duties, nor undermine legitimate goals and mission of FCC.

80.     The reprimand that went into his personnel file concluding that Dr. Lopez was "unprofessional," his work "unsatisfactory," that he created a hostile environment and that Bible references he made were "indoctrination," and which ordered him to cease using religious material in assigned readings and as an authority, caused Dr. Lopez to suffer an injury which chills him from giving his students facts calculated to stimulate critical thinking. The reprimand, which punishes Dr. Lopez because he followed the District policy on critical thinking, has cast a pall of orthodoxy on instruction at FCC.

81.     Dr. Lopez has a right to academic freedom of inquiry derived from the guarantee

of free speech, to teach and to communicate ideas or facts without being targeted for

employment sanctions and censorship. By subjecting Dr. Lopez to a one-sided investigation and

reprimanding him based on his research, established principles, statistics and critical thinking

teaching methods on a matters of public concern, Defendants policy and practice, are a form of

retaliation against Plaintiff because of his First Amendment rights and deprived him of his ability

to freely express his ideas on issues of public concern at FCC.

82.     Defendants, acting under color of state law, and by policy and practice, knew or

should have known that they explicitly and implicitly retaliated against Plaintiff for exercising

his clearly established right to free speech without retaliation on issues of public concern.

83.     Defendants are not entitled to immunity because their conduct violated Plaintiff's

First Amendment right which was so clearly established, that a reasonable person would have

known that his actions violated that right.

84.     Because of Defendants' actions, Plaintiff has suffered, and continues to suffer,

irreparable harm to his reputation in the college community.

85.     Dr. Lopez is entitled to monetary damages in an amount to be determined by

the evidence and the Court, including nominal, actual, and punitive damages.

86.     Pursuant to 42 U.S.C. § and 1988, Dr. Lopez therefore seeks equitable relief as

follows: (1) a declaration as to whether the acts of the Defendants Azari and Villa were

consistent under the First, Fourteenth Amendments and under District policy, and (2), injunctive

relief to remove the reprimand from his personal file in the form of papers, writings, in whatever

form, be they electronic or otherwise, relative to the disciplinary actions taken against Dr. Lopez.

**Count II-Violation of Freedom of Speech under the U.S. Constitution (42 U.S.C. § 1983)**

**First Amendment viewpoint discrimination – All Defendants**

87.     Plaintiff hereby reiterates and adopts each and every allegation in the preceding paragraphs 1-86.

88.     The application of the District's harassment policy continues to censure Dr. Lopez's speech because he is still under disciplinary restrictions of the letter sent.

89.     Defendants, acting under color of state law, and by policy and practice, knew or should have known that they explicitly and implicitly discriminated against Dr. Lopez for expressing his viewpoint.

90.     Defendants are not entitled to immunity because their conduct violated Dr. Lopez's First Amendment right to have a viewpoint which was so clearly established, that a reasonable person would have known that his actions violated that right.

91.     Because of Defendants' actions, Dr. Lopez has suffered, and continues to suffer, irreparable harm to his reputation in the college community.

92.     Dr. Lopez is entitled to monetary damages in an amount to be determined by the evidence and the Court, including nominal, actual, and punitive damages.

93.     Pursuant to 42 U.S.C. § and 1988, Dr. Lopez therefore seeks equitable relief as follows: (1) a declaration as to whether the acts of the Dr. Azari and Dr. Villa were consistent under the First Amendment and under District policy, and (2), injunctive relief to remove the reprimand from his personal file in the form of papers, writings, in whatever form, be they electronic or otherwise, relative to the disciplinary actions taken against Dr. Lopez.

**Count III- Violation of Plaintiff's Fourteenth Amendment Right to Due Process of Law (42 U.S.C. § 1983) –All Defendants**

94.     Dr. Lopez hereby reiterates and adopts each and every allegation in the preceding paragraphs 1-93.

95.     In violation of Dr. Lopez's Fourteenth Amendment liberty of speech interest, Defendants erroneously accused Dr. Lopez of insulting gays and lesbians and of "teaching religious principles in place of established curriculum," because he used supplemental material to give students optional assignments from differing historical, modern and moral viewpoints and to inform and stimulate critical thinking as required by District policy. Because using supplemental materials and giving optional and ungraded assignments is allowed under FCC policy, and because critical thinking is mandated by FCC, the academic senate and curriculum committee at FCC, Defendants deprived Dr. Lopez of a liberty interest without due process of law.

96.     Because Dr. Azari, relying on Dr. Villa's investigation, threatened to dismiss Dr. Lopez, a tenured faculty member, if he did not immediately cease to offer viewpoints from the Bible or other religious texts or to give occasional (optional and ungraded) assignments from supplemental material as allowed by FCC policy, Dr. Azari threatened Dr. Lopez's constitutionally protected property interest to Dr. Lopez's future employment as he was entitled to maintain.

97.     In violation of basic procedural guarantees mandated by the Fourteenth Amendment, Defendants ignored the several levels of appeal enumerated in the FCC "grievance petition" form, thus denying Dr. Lopez the opportunity to resolve any problem directly with the aggrieved students before a formal investigation was launched. Defendants accepted a grievance from a student who had never attended Dr. Lopez's class, and Dr. Villa changed the nature of that grievance to a complaint of sexual harassment. The Defendants erred by accepting a belated filing of a sexual harassment form from the same student who had never attended Dr. Lopez's class and a letter from another student who had failed to file a grievance within the required

thirty (30) days after the beginning of the fall or spring semester following the date of the alleged events.  Defendants also generally changed the nature of grievances and letter to complaints for environmental harassment.

98.     Dr. Villa deprived Dr. Lopez of a fair hearing when he forbade Dr. Lopez from asking questions during meetings and limited him only to answering them. Dr. Villa denied Dr. Lopez a copy of the notes in two meetings, one with Dr Lopez, Garry Kennedy and Dr. Villa's secretary, and the second meeting with Dr. Lopez, Charles Magill, Garry Kennedy and Dr.Villa's secretary. Dr. Villa indicated at both meetings that I could have copies of the meeting notes written by his secretary. At the beginning of the first meeting we requested that we would like to video record the meeting. Dr. Villa indicated that would not be necessary because we could have the meeting notes written by his secretary for both meetings. Despite numerous emails and telephone requests he denied that he said that we could have a copy of the meeting notes. He verbally denied this when Dr. Lopez, Charles Magill, Garry Kennedy and Dr.Villa's secretary were in attendance at the meetings. As of this writing we have not received requested meeting notes from Dr. Villa.

Dr. Villa failed to timely communicate documents in order to allow Dr. Lopez to adequately defend himself. In so far as Dr. Azari based her reprimand on Dr. Villa's investigation, both Defendants denied Dr. Lopez adequate procedural protections.

99.     Dr. Lopez was further deprived of an opportunity to be heard adequately because Dr. Villa conducted an investigation which was calculated to favor to the aggrieved students. Dr. Villa did not provide information and statistics to disprove Dr. Lopez's research, but was quick to inform the aggrieved students of the final administrative decision against Dr. Lopez on March 8, 2010, sixteen (16) days before Dr. Azari sent the reprimand to Dr. Lopez. Not once during the

investigation did Dr. Villa extend Dr. Lopez the same courtesy and procedural consideration he extended to the students.

100.     Defendants failed to substantiate claims of indoctrination, misapprehended Dr. Lopez's words to say he insulted homosexuals, and refused to consider the observations and responses Dr. Lopez made. Defendants completely ignored documents from past evaluations and from Dr. Lopez, which showed that over years, the vast majority of the students liked Health Science 1 and appreciated the instructor. Defendants equally ignored e-mails and letters sent by concerned citizens, former and current students in support of Dr. Lopez. Dr. Lopez was once again deprived of the opportunity to be heard adequately.

101.     Defendants were acting under color of state law.

102.     Because of Defendants' actions, Plaintiff has suffered, and continues to suffer, irreparable emotional injury and harm to his reputation in the college community. He, therefore, is entitled to an award of monetary damages, including nominal, actual, and punitive damages.

103.     Pursuant to 42 U.S.C. § and 1988, Dr. Lopez therefore seeks equitable relief as follows: (1) a declaration as to whether the acts of the Defendants Azari and Villa were consistent under the First, Fourteenth Amendments and under District policy, and (2), injunctive relief to remove the reprimand from his personal file in the form of papers, writings, in whatever form, be they electronic or otherwise, relative to the disciplinary actions taken against Dr. Lopez.

**Count IV- Violation of Plaintiff's Rights to Academic Freedom under District policy**

**(Administrative Regulation 4030) – All Defendants**

104.     Dr. Lopez hereby reiterates and adopts each and every allegation in the preceding paragraphs 1-103.

105.    The actions of Defendants violated FCC's policy on academic freedom. Said policy is based upon the Free Speech Clause of the First Amendment.

106.    The actions of Dr. Azari and Dr. Villa were calculated to violate Plaintiff's rights of academic freedom and by extension his rights to free speech, said actions violated Dr. Lopez's right as instructor to discuss pertinent subjects within his field of professional competency in the classroom, which was consistent with course objectives.

107.    Because of Defendants' actions, Dr. Lopez has suffered, and continues to suffer, undue and actual hardship and irreparable harm to his reputation in the college community.

108.    Dr. Lopez is therefore is entitled to an award of monetary damages, including nominal, actual, and punitive damages.

109.    Pursuant to 42 U.S.C. § and 1988, Dr. Lopez therefore seeks equitable relief as follows: (1) a declaration as to whether the acts of the Defendants Azari and Villa were consistent under the First, Fourteenth Amendments and under District policy, and (2), injunctive relief to remove the reprimand from his personal file in the form of papers, writings, in whatever form, be they electronic or otherwise, relative to the disciplinary actions taken against Dr. Lopez.

**Count V-Violation of Plaintiff's Rights to Academic Freedom under 5 C.C.R § 53200**

**The freedom to teach critical thinking – All defendants**

110.    Dr. Lopez hereby reiterates and adopts each and every allegation in the preceding paragraphs 1-109.

111.    § 53200 (2) (a) 2F provides:

"The coursework calls for critical thinking and the understanding and application of concepts determined by the curriculum committee to be at college level."

112.    The Course outline of record, curriculum reference guide provides:

"Assignment examples can include supplemental reading materials beyond the

required text (s).....

Optional and alternate assignment examples can in some cases, be included..

The difficulty standard for degree-applicable credit courses requires that

assignments must reflect college-level effort particularly in terms of critical

thinking."

113.    The statewide Academic Senate guide on critical thinking was adopted by the

District and FCC, the academic senate, and curriculum committee at FCC which mandates that

professors include "critical thinking" within the class syllabus.

114.    Dr. Lopez's personnel file was tarnished and he was disciplined because he

complied with District's and FCC's policy on critical thinking.

115.    Because of Defendants' actions, Plaintiff has suffered, and continues to suffer,

undue and actual hardship and irreparable harm to his reputation in the college community.

116.    Dr. Lopez is entitled to monetary damages in an amount to be determined by

the evidence and the Court, including nominal, actual, and punitive damages.

117.    Pursuant to 42 U.S.C. § and 1988, Dr. Lopez therefore seeks equitable relief as

follows: (1) a declaration as to whether the acts of the Defendants Azari and Villa were

consistent under the First, Fourteenth Amendments and under District policy, and (2), injunctive

relief to remove the reprimand from his personal file in the form of papers, writings, in whatever

form, be they electronic or otherwise, relative to the disciplinary actions taken against Dr. Lopez.

**Count VI-Violation of Plaintiff's Fourteenth Amendment due process rights by District**

**policy on prohibition of harassment on its face and as applied (Administrative Regulation**

**3430) – All Defendants**

118.    Dr. Lopez hereby reiterates and adopts each and every allegation in the preceding paragraphs 1-117.

119.    District's and FCC's prohibition of harassment policy is unconstitutional as applied because any third party, present in class who is offended at comments not directed at them or at anyone they know in class can require, without providing proof of their allegations, an instructor to be sanctioned because of sexual or environmental harassment. By providing that harassment policies prevail over academic freedom, the District and FCC's policy is unconstitutional on its face because it gives regulations greater weight than the academic freedom recognized under the First Amendment of the American constitution.

120.    District policy is also unconstitutional on its face because it makes a third party judge of whether or not speech is harassment thereby exposing instructors to a "heckler's veto."

121.    Mr. Burts filed a formal grievance against Dr. Lopez, although he had never sat in class or met Dr. Lopez prior to November 5, 2009. He was offended by proxy, in sympathy to his offended friend. Based on the totality of these circumstances, Mr. Burts could not have been environmentally harassed by Dr. Lopez's Health Science 1 class, directly or even as a witness. The FCC prohibition of harassment policy is unconstitutional as applied because any third party, not even present in class and who is offended by hearsay statements allegedly directed against other persons, can subject an instructor to employment sanctions and censorship.  The policy is also unconstitutional on its face because it makes a third party judge of whether or not speech is harassment.

122.    The FCC prohibition of harassment policy is unconstitutional on its face because it trumps rights under the First Amendment.

123.    Dr. Lopez is entitled to monetary damages in an amount to be determined by

the evidence and the Court, including nominal, actual, and punitive damages.

124.    A person of ordinary intelligence would not know whether he/she is in violation of the policy.

125.    Pursuant to 42 U.S.C. § and 1988, Dr. Lopez therefore seeks equitable relief as follows: (1) a declaration as to whether the acts of the Defendants Azari and Villa were consistent under the First, Fourteenth Amendments and under District policy, and (2), injunctive relief to remove the reprimand from his personal file in the form of papers, writings, in whatever form, be they electronic or otherwise, relative to the disciplinary actions taken against Dr. Lopez.

## PRAYER FOR RELIEF

Plaintiff Brad Lopez respectfully requests that the Court enter judgment against Defendants Azari, and Villa, and provide him with the following relief:

A.    A declaratory judgment as to whether the acts of the Defendants Azari and Villa were consistent with the First and Fourteenth Amendments and with District policy.

B.    For a preliminary and permanent injunction requiring Dr. Azari to expunge from Plaintiff's personnel file, all the reprimand and all papers, writings, in whatever form, be they electronic or otherwise, relative to the disciplinary actions taken against Dr. Lopez.

C.    Monetary compensatory damages according to proof.

D.    Punitive damages from the Defendants in their individual capacities.

E.    Dr. Lopez's reasonable costs and expenses of this action, including attorneys' fees, in accordance with 42 U.S.C. § 1988 and other applicable law;

F.    All other further relief to which Dr. Lopez may be entitled.

Respectfully submitted this ___ day of _____, 2011,


_____
    Charles F. Magill
    Laura M. Guzman Magill




*Attorneys for Plaintiff*

**FRCP 7.1 CORPORATE DISCLOSURE STATEMENT**

       This Corporate Disclosure Statement is filed on behalf of Dr. Brad Lopez in compliance with Federal Rule of Civil Procedure 7.1.

       Dr. Brad Lopez is an individual; he has no parent corporation and has not issued, nor will issue, publicly held stock.  Thus, no other corporation holds any stock in Dr. Brad Lopez.

       A supplemental disclosure statement will be filed upon any change in the information provided herein.

       Respectfully submitted this ___ day of ____, 2011,


_____
    Charles F. Magill
    Laura M. Guzman Magill


    Attorneys for Plaintiff

**Academic Freedom**

Intellectual freedom and responsibility. Intellectual freedom is to be guarded as a basic right of all citizens in a free society. To this end, the colleges of the district are committed to free discussion and open inquiry in the pursuit of truth. It is recognized that freedom to think, to read, to speak and to question is necessary to the development of an informed citizenry. This freedom shall be integral to the philosophy of this district and is guaranteed to all staff and students.

For each faculty member, intellectual freedom is both a right and a responsibility. As a right, it guarantees the instructor freedom to interpret personal findings and to communicate the conclusions without being subjected to interference, molestation, or penalty because the conclusions are at variance with those of other persons. As, a responsibility, it carries the obligation to study, to investigate, to present, to discuss and to interpret fairly and objectively facts and ideas related to the instructor's assignments and to avoid teaching material which has no relation to the subject.

Since human knowledge is limited and changeable, the instructor will acknowledge the facts on which controversial views are based and show respect for opinions held by others. While striving to avoid bias, the instructor will cite the evidence available and present the conclusions to which the instructor believes this evidence points without limiting the freedom of the student to express and defend the students own views and beliefs. With the understanding that the student must also respect the rights of others, the student shall have the freedom to question and differ without jeopardy to the student's scholastic standing.

The college faculty member is a citizen, a member of a learned profession, and an employee of an educational institution. As a person of learning and an educational employee, the faculty member should remember that the public judges the profession and the institution by his/her utterances. Hence, the faculty member should at all times be accurate, should show respect for the opinions of others, and should make every effort to indicate that he/she is not an institutional spokesperson.

To insure these principles of intellectual freedom for this district's colleges, the administration and the board, as the governing body of the district, will demonstrate their support by actively working toward a climate which will foster this freedom. Such participation will extend to the point of defending and supporting any tenured or non-tenured faculty member who, while maintaining the high standards of the profession, finds personal freedom of expression unfairly attacked or curtailed.

BP 4030

**Academic Freedom** (continued) Freedom of Speech, Political Activities

The governing board recognizes the right of any employee of the district to take or refrain from taking a stand on any political issue and to support or oppose any issue or candidate. In accordance with the Education Code, such activities must be conducted on the employee's own time. The employee will exercise reasonable care to show that he/she is acting in his/her capacity as a private citizen. Nothing in this policy shall prevent:

1.      The discussion and study of political, social, and moral issues when such discussion and study are appropriate to the subject matter of a course.

2.      The conducting of student and employee elections and campaigning connected therewith.

See Administrative Regulation 4030 Reference:      Title 5 Section 51023; Accreditation Standard 2.2Adopted by the Governing Board: June 8, 1978; June 4, 1996; October 5, 2004 Revised:      October 13, 1982; January 1984; July 1,